UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 00975

————————————————————X

ROBERT GARBER, Derivatively on Behalf of
JPMORGAN CHASE & CO.,

          Plaintiff,

  vs.

JAMES DIMON, INA R. DREW, JAY
MANDELBAUM, CHARLES W. SCHARF,
HEIDI MILLER, STEVEN D. BLACK,
SAMUEL TODD MACLIN, JAMES E.
STALEY, MICHAEL J. CAVANAGH,
WILLIAM T. WINTERS, JOHN F. BRADLEY,
FRANK BISIGNANO, LOUIS
RAUCHENBERGER, LEE R. RAYMOND,
JAMES S. CROWN, WILLIAM H. GRAY, III,
LABAN P. JACKSON, JR., ELLEN V.
FUTTER, DAVID C. NOVAK, STEPHEN B.
BURKE, ROBERT I. LIPP, WILLIAM C.
WELDON, CRANDALL C. BOWLES, DAVID
M. COTE, WILLIAM B. HARRISON, JR.,
WILLIAM H. MCDAVID, JOSEPH L.
SCLAFANI, DON M. WILSON, III, AUSTIN A.
ADAMS, RICHARD J. SREDNICKI,
RICHARD A. MANOOGIAN, JOHN A.
KESSLER and JOHN H. BIGGS,

          Defendants,

  -and-

JPMORGAN CHASE & CO., a Delaware
corporation,

          Nominal Defendant.

————————————————————X

Civil Action No.



DEMAND FOR JURY TRIAL

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of JPMorgan Chase & Co. ("JPMorgan" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets and unjust enrichment that occurred between January 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to JPMorgan and other damages, such as to its reputation and goodwill.

2.      JPMorgan provides a wide range of financial services. During the Relevant Period, JPMorgan, under defendants' direction, recklessly acquired and maintained billions of dollars worth of subprime mortgage related assets, including collateralized debt obligations ("CDOs") backed by subprime mortgage related assets. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers. Despite these material adverse circumstances, defendants directed JPMorgan to issue a series of improper statements that proclaimed record results.

3.      The defendants' actions are particularly disturbing considering that JPMorgan was acutely aware of the risks that subprime mortgages create. A *Business Week* article from *December 26, 2005*, cites JPMorgan's research that estimates subprime loans make up close to 9% of mortgage debt. A large enough amount "to make a downturn [in the housing market] worse if these loans begin to fall in large numbers." This statement proved to be prophetic.

4.      Beginning in July 2007, JPMorgan began disclosing the true extent of its exposure to the widening subprime mortgage crisis, dramatically increasing its provision for losses due to the weakening housing market. Then, on October 17, 2007, JPMorgan informed investors that it was marking down $1.3 billion worth of leveraged lending funded and unfunded commitments and $339 million worth of CDOs.

5.    The Company's billion and a half dollar write-down, however, was not enough to sufficiently cover its exposure to the subprime crisis. On January 16, 2008, the Company announced it would have to write-down another $1.3 billion due to exposure to subprime loans.

6.    While defendants were directing JPMorgan to issue improper statements concerning its exposure to the subprime market crisis, they were also directing JPMorgan to repurchase over $11.6 billion worth of its own shares at artificially inflated prices. Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $211 million in proceeds.

7.    As a result of the improper financial reporting, JPMorgan's credibility with investors has diminished. During the Relevant Period, JPMorgan's value declined from over $53 per share to less than $40 per share—a $43.8 billion market capitalization loss.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) JPMorgan maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful

-2-

acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to JPMorgan occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.  Plaintiff Robert Garber is and was, at times relevant hereto, an owner and holder of JPMorgan common stock.

12.  Nominal defendant JPMorgan is a Delaware corporation with its principal executive offices located at 270 Park Avenue, New York, New York. JPMorgan provides a wide range of financial services.

13.  Defendant James Dimon ("Dimon") is JPMorgan's Chairman of the Board and has been since December 2006. Dimon is also JPMorgan's President and has been since July 2004 and Chief Executive Officer ("CEO") and has been since December 2005. Dimon is also a JPMorgan director and has been since 2000. Dimon was JPMorgan's Chief Operating Officer from July 2004 to December 2005. Because of his positions, defendant Dimon knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Dimon participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. During the Relevant Period, defendant Dimon received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $13,000,000 | $7,165,705 | $17,353,321 | $46,445 | $487,858 |

Defendant Dimon sold 1,507,623 shares of JPMorgan stock for $64,495,546.06 in proceeds while in possession of material non-public information.

-3-

14.    Defendant Ina R. Drew ("Drew") is JPMorgan's Chief Investment Officer and has been since February 2005. Because of her position, defendant Drew knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Drew participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Drew sold 640,693 shares of JPMorgan stock for $33,244,812.32 in proceeds while in possession of material non-public information.

15.    Defendant Jay Mandelbaum ("Mandelbaum") is JPMorgan's Head of Strategy and Business Development and has been since at least July 2004. Because of his position, defendant Mandelbaum knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Mandelbaum participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Mandelbaum sold 545,086 shares of JPMorgan stock for $26,473,074.76 in proceeds while in possession of material non-public information.

16.    Defendant Charles W. Scharf ("Scharf") is JPMorgan's CEO of Retail Financial Services and has been since July 2004. Because of his position, defendant Scharf knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Scharf participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.    Defendant Scharf sold 390,911 shares of JPMorgan stock for $16,794,643.45 in proceeds while in possession of material non-public information.

17.    Defendant Heidi Miller ("Miller") is JPMorgan's CEO of Treasury & Securities Services and has been since July 2004. Because of her position, defendant Miller knew, consciously

- 4 -

disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Miller participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Miller sold 309,267 shares of JPMorgan stock for $15,019,989.37 in proceeds while in possession of material non-public information.

18.    Defendant Steven D. Black ("Black") is JPMorgan's Co-CEO of the Investment Bank and has been since March 2004. Because of his position, defendant Black knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Black participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. During the Relevant Period, defendant Black received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings |
|---|---|---|---|---|---|
| 2006 | $400,000 | $10,300,000 | $17,499,603 | $1,416,564 | $18,974 |

Defendant Black sold 192,040 shares of JPMorgan stock for $9,946,350.80 in proceeds while in possession of material non-public information.

19.    Defendant Samuel Todd Maclin ("Maclin") is JPMorgan's Head of Commercial Banking and has been since July 2004. Because of his position, defendant Maclin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Maclin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Maclin sold 133,138 shares of JPMorgan stock for $6,586,128.85 in proceeds while in possession of material non-public information.

20.      Defendant James E. Staley ("Staley") is JPMorgan's CEO of Asset Management and
has been since at least March 2007. Staley was JPMorgan's Global Head of Asset & Wealth
Management from 2001 to about March 2007. Because of his positions, defendant Staley knew,
consciously disregarded, was reckless and grossly negligent in not knowing and should have known
the adverse, non-public information about the business of JPMorgan. During the Relevant Period,
Staley participated in the issuance of improper statements, including the preparation of the improper
press releases and SEC filings and approval of other statements made to the press, securities analysts
and JPMorgan shareholders. Defendant Staley sold 117,075 shares of JPMorgan stock for
$6,070,408.85 in proceeds while in possession of material non-public information.

21.      Defendant Michael J. Cavanagh ("Cavanagh") is JPMorgan's Chief Financial Officer
and has been since September 2004. Because of his position, defendant Cavanagh knew, consciously
disregarded, was reckless and grossly negligent in not knowing and should have known the adverse,
non-public information about the business of JPMorgan. During the Relevant Period, Cavanagh
participated in the issuance of improper statements, including the preparation of the improper press
releases and SEC filings and approval of other statements made to the press, securities analysts and
JPMorgan shareholders. During the Relevant Period, defendant Cavanagh received the following
compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings |
|---|---|---|---|---|---|
| 2006 | $500,000 | $3,000,000 | $1,407,365 | $2,221,760 | $23,380 |

Defendant Cavanagh sold 72,576 shares of JPMorgan stock for $3,338,284.52 in proceeds while in
possession of material non-public information.

22.      Defendant William T. Winters ("Winters") is JPMorgan's Co-CEO of the Investment
Bank and has been since March 2004. Because of his position, defendant Winters knew, consciously
disregarded, was reckless and grossly negligent in not knowing and should have known the adverse,
non-public information about the business of JPMorgan. During the Relevant Period, Winters
participated in the issuance of improper statements, including the preparation of the improper press
releases and SEC filings and approval of other statements made to the press, securities analysts and

JPMorgan shareholders. During the Relevant Period, defendant Winters received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings |
|---|---|---|---|---|---|
| 2006 | $519,150 | $10,300,000 | $17,626,693 | $1,722,349 | $160,362 |

Defendant Winters sold 74,025 shares of JPMorgan stock for $3,265,242.75 in proceeds while in possession of material non-public information.

23.     Defendant John F. Bradley ("Bradley") is JPMorgan's Director of Human Resources and has been since December 2005. Bradley was JPMorgan's Head of Human Resources for Europe and Asia regions from April 2003 to December 2005; a Human Resources executive for Technology and Operations from 2002 to April 2003 and was responsible for JPMorgan's human resources integration efforts in 2001. Because of his positions, defendant Bradley knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Bradley participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.    Defendant Bradley sold 35,478 shares of JPMorgan stock for $1,753,287.84 in proceeds while in possession of material non-public information.

24.     Defendant Frank Bisignano ("Bisignano") is JPMorgan's Chief Administrative Officer and has been since December 2005. Because of his position, defendant Bisignano knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Bisignano participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.    Defendant Bisignano sold 36,573 shares of JPMorgan stock for $1,676,872.05 in proceeds while in possession of material non-public information.

-7-

25.    Defendant Louis Rauchenberger ("Rauchenberger") is JPMorgan's Corporate Controller and has been since December 2006. Rauchenberger was JPMorgan's Deputy Controller from June 2005 to December 2006. Because of his positions, defendant Rauchenberger knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Rauchenberger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Rauchenberger sold 19,519 shares of JPMorgan stock for $1,007,308.38 in proceeds while in possession of material non-public information.

26.    Defendant Lee R. Raymond ("Raymond") is a JPMorgan director and has been since 1987.    Raymond is currently a Chairman of JPMorgan's Compensation and Management Development Committee. Raymond was a member of JPMorgan's Compensation and Management Development Committee in 2007 and Chairman in 2006. Because of his positions, defendant Raymond knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Raymond participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

27.    Defendant James S. Crown ("Crown") is a JPMorgan director and has been since 1991. Crown is Chairman of JPMorgan's Risk Policy Committee and has been since at least 2006. Because of his positions, defendant Crown knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Crown participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

-8-

28.    Defendant William H. Gray, III ("Gray") is a JPMorgan director and has been since 1992. Gray is a member of JPMorgan's Audit Committee and was a member of the Compensation and Management Development Committee from at least 2006 to 2007. Because of his positions, defendant Gray knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Gray participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

29.    Defendant Laban P. Jackson, Jr. ("Jackson") is a JPMorgan director and has been since 1993. Jackson is Chairman of JPMorgan's Audit Committee and has been since at least 2006. Because of his positions, defendant Jackson knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Jackson participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

30.    Defendant Ellen V. Futter ("Futter") is a JPMorgan director and has been since 1997. Futter is a member of JPMorgan's Risk Policy Committee and has been since at least 2006. Because of her positions, defendant Futter knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Futter participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

31.    Defendant David C. Novak ("Novak") is a JPMorgan director and has been since 2001. Novak is a member of JPMorgan's Compensation and Management Development Committee. Novak was Chairman of JPMorgan's Compensation and Management Development Committee in 2007 and a member in 2006. Because of his positions, defendant Novak knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse,

non-public information about the business of JPMorgan. During the Relevant Period, Novak participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

32.     Defendant Stephen B. Burke ("Burke") is a JPMorgan director and has been since 2003. Burke is a member of JPMorgan's Compensation and Management Development Committee and has been since at least 2006. Because of his positions, defendant Burke knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Burke participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

33.     Defendant Robert I. Lipp ("Lipp") is a JPMorgan director and has been since 2003. Lipp is a member of JPMorgan's Risk Policy Committee and has been since at least 2006. Because of his positions, defendant Lipp knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Lipp participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

34.     Defendant William C. Weldon ("Weldon") is a JPMorgan director and has been since 2005. Weldon is a member of JPMorgan's Compensation and Management Development Committee and has been since at least 2006. Because of his positions, defendant Weldon knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Weldon participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

35.    Defendant Crandall C. Bowles ("Bowles") is a JPMorgan director and has been since November 2006. Bowles is a member of JPMorgan's Audit Committee and has been since at least 2006. Because of his positions, defendant Bowles knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Bowles participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

36.    Defendant David M. Cote ("Cote") is a JPMorgan director and has been since July 2007. Cote is a member of JPMorgan's Risk Policy Committee and has been since 2007. Because of his positions, defendant Cote knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Cote participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

37.    Defendant William B. Harrison, Jr. ("Harrison") was JPMorgan's Chairman of the Board from November 2001 to December 2006. Harrison was also JPMorgan's CEO from December 2000 to December 2005; President from December 2000 to November 2001; and a director from 1991 to December 2006. Because of his positions, defendant Harrison knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Harrison participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. During the Relevant Period, defendant Harrison received the following compensation:

| Fiscal Year 2006 | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $21,000,000 | $13,550,031 | $3,906,528 | $1,509,330 | $892,331 |

Defendant Harrison sold 192,188 shares of JPMorgan stock for $9,011,480.18 in proceeds while in possession of material non-public information.

38.    Defendant William H. McDavid ("McDavid") was JPMorgan's Co-General Counsel from July 2004 to at least May 2006. Because of his position, defendant McDavid knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, McDavid participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant McDavid sold 121,008 shares of JPMorgan stock for $5,567,873.28 in proceeds while in possession of material non-public information.

39.    Defendant Joseph L. Sclafani ("Sclafani") was JPMorgan's Corporate Controller from at least January 1994 to December 2006. Because of his position, defendant Sclafani knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Sclafani participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Sclafani sold 48,000 shares of JPMorgan stock for $2,170,855.35 in proceeds while in possession of material non-public information.

40.    Defendant Don M. Wilson, III ("Wilson") was JPMorgan's Chief Risk Officer from July 2003 to at least December 2006. Wilson was also JPMorgan's Co-Head of Credit & Rate Markets from 2001 to July 2003. Because of his positions, defendant Wilson knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Wilson

-12-

participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Wilson sold 43,388 shares of JPMorgan stock for $2,000,186.80 in proceeds while in possession of material non-public information.

41.    Defendant Austin A. Adams ("Adams") was JPMorgan's Chief Information Officer from July 2004 to October 2006. Because of his position, defendant Adams knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Adams participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Adams sold 43,032 shares of JPMorgan stock for $1,828,860 in proceeds while in possession of material non-public information.

42.    Defendant Richard J. Srednicki ("Srednicki") was JPMorgan's CEO of Card Services from July 2004 to at least July 2007. Srednicki was also JPMorgan's Executive Vice President from 1999 to July 2004. Because of his positions, defendant Srednicki knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Srednicki participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders. Defendant Srednicki sold 16,883 shares of JPMorgan stock for $866,908.41 in proceeds while in possession of material non-public information.

43.    Defendant Richard A. Manoogian ("Manoogian") was a JPMorgan director from 1978 to March 2007. Manoogian was a member of JPMorgan's Audit Committee from at least 2006 to March 2007. Because of his positions, defendant Manoogian knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Manoogian participated in the issuance of improper statements, including the preparation of the improper press releases and

-13-

SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

44.    Defendant John A. Kessler ("Kessler") was a JPMorgan director from 1995 to March 2007. Kessler was a member of JPMorgan's Compensation and Management Development Committee from at least 2006 to March 2007. Because of his positions, defendant Kessler knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Kessler participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

45.    Defendant John H. Biggs ("Biggs") was a JPMorgan director from 2003 to March 2007. Biggs was a member of JPMorgan's Audit Committee from at least 2006 to March 2007. Because of his positions, defendant Biggs knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of JPMorgan. During the Relevant Period, Biggs participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and JPMorgan shareholders.

46.    The defendants identified in ¶¶13, 26-37, 43-45 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-25, 38-42 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-25, 37-42 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

47.    By reason of their positions as officers, directors and/or fiduciaries of JPMorgan and because of their ability to control the business and corporate affairs of JPMorgan, the Individual Defendants owed JPMorgan and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage JPMorgan

-14-

in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JPMorgan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

48.     Each director and officer of the Company owes to JPMorgan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of JPMorgan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with JPMorgan, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of JPMorgan.

50.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of JPMorgan, and was at all times acting within the course and scope of such agency.

51.     To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of JPMorgan were required to, among other things:

        (a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how JPMorgan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

52.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of JPMorgan, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the

-16-

Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of JPMorgan's Board during the Relevant Period.

53.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects and results; (ii) enhance the Individual Defendants' executive and directorial positions at JPMorgan and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) allow the Individual Defendants to sell over $211 million of their personally held shares; and (iv) deceive the investing public, including shareholders of JPMorgan, regarding the Individual Defendants' management of JPMorgan's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

56.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that JPMorgan was misrepresenting its business prospects.

-17-

57.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

58.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

59.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

### THE SUBPRIME MARKET CRISIS

60.    JPMorgan provides a wide range of financial services including commercial and residential mortgage loans. During times relevant hereto, the Individual Defendants directed JPMorgan to provide those services in connection with mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

61.    In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm. This is exactly what has been occurring since at least mid-2006.

62.    In fact, as early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially

-18-

because the risk of delinquency would be heightened by a downturn in the housing market. For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as ... subprime mortgages for low-income home buyers." As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, "[e]asy financing helps people buy homes, but also raises foreclosure risks."

63.     Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that "subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans."

64.     In a December 26, 2005 *Business Week* article, JPMorgan itself estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

65.     Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006. In her speech, Bies noted that "the Federal Reserve and other banking supervisors [were] concerned that [then-current] risk-management techniques may not fully address the level of risk in nontraditional mortgages, [such as subprime mortgages] a risk that would be heightened by a downturn in the housing market." Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

66.     These concerns rang true in 2006, as a subprime mortgage crisis erupted. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

67.     Throughout the Relevant Period, the Individual Defendants recklessly directed JPMorgan to acquire and maintain a mortgage portfolio containing billions of dollars worth of

subprime mortgage related assets. Moreover, the Individual Defendants caused or allowed JPMorgan to improperly report its exposure to losses on those assets as alleged herein.

## IMPROPER STATEMENTS

68. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to JPMorgan a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

69. This material, non-public information principally included JPMorgan's exposure to the subprime lending market crisis. Further, defendants Bowles, Gray, Manoogian, Biggs and Jackson, as members of the Audit Committee during the Relevant Period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing and discussing with management guidelines and policies for assessing and managing: (i) the Company's exposure to risks, including reputation risk; (ii) the Company's major financial risk exposures; and (iii) the steps management has taken to monitor and control such exposures. Defendants Cote, Futter, Crown and Lipp, as members of the Risk Policy Committee, also had a special duty to know and understand this material information as set out in the Risk Policy Committee's charter, which provides that the Risk Policy Committee is responsible for overseeing the CEO's and senior management's responsibilities to assess and manage the Company's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputation risk. In performing this oversight, the Risk Policy Committee must: (i) review with management guidelines and policies to govern the process for assessing and managing such risks; (ii) review benchmarks for and major financial risk exposures from such risks; (iii) receive and review reports from management of the steps it has taken to monitor and control such exposures; (iv) review management's performance against these policies and benchmarks; (v) receive and review reports on selected risk topics as management deems appropriate from time to time; (vi) review the

corporation's capital allocation; and (vii) review reports of significant issues prepared by internal risk oversight functional groups.

70.    The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants, as directors of JPMorgan, had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by JPMorgan to the investing public and the Company's shareholders during the Relevant Period.

71.    On January 18, 2006, the Individual Defendants caused or allowed JPMorgan to issue a press release announcing its fourth quarter 2005 earnings. According to the press release, JPMorgan's retail financial services operating earnings and net revenue increased from the prior year. The press release also stated that JPMorgan's investment banking division decreased its provision for credit losses due to the "continued strong quality of the credit portfolio." In particular, the press release stated:

INVESTMENT BANK (IB)

* * *

Discussion of Results:

Operating earnings of $664 million were essentially flat from the prior year and down 38% from the prior quarter. Compared with the prior year, results reflected flat revenues, while lower compensation expense was offset by a reduced benefit from the provision for credit losses. The decrease in earnings versus the prior quarter was related primarily to lower trading results compared with a record third quarter, partially offset by lower performance-based compensation expense and higher investment banking fees.

Net revenue of $3.2 billion was flat compared with the prior year and down 29% from the prior quarter. Investment banking fees were strong at $1.2 billion, up 8% from the prior year and 18% from the prior quarter and were the highest since the first quarter of 2000. Advisory fees of $341 million were up 36% from last year, with strong performance in the Americas and Europe. Debt underwriting fees of $509 million were down 18% from last year, largely due to lower loan syndication fees. Equity underwriting fees of $311 million were up 46% from the prior year, driven by strength in Asia and Europe. Both advisory and equity underwriting

-21-

performance benefited from the Cazenove joint venture that closed in the first quarter of 2005. Fixed Income Markets revenue of $1.1 billion was down 28%, or $426 million versus last year, and down 55% from a record third quarter due to weak trading results, primarily from poor positioning in U.S. interest rate and commodities markets. Equity Markets revenue of $458 million increased by $215 million, or 88%, reflecting improved trading compared with the prior year, as well as stronger commissions. Compared with the prior quarter, Equity Markets revenue was down 36%, primarily due to lower trading revenue. Credit portfolio revenues of $464 million were up by $116 million, or 33% from the prior year, reflecting increased trading revenues from hedging activities.

***The provision for credit losses was a benefit of $83 million, compared with a benefit of $173 million in the prior year and a $46 million benefit in the prior quarter. The benefit reflects the continued strong quality of the credit portfolio.***

Noninterest expense was $2.2 billion, down by $229 million, or 10%, from the prior year and down by $714 million, or 25%, from the prior quarter. Declines for both periods were driven primarily by lower incentive compensation. In addition, expenses in the current quarter increased due to the joint venture with Cazenove.

Other Highlights Include:

- Highest annual Total Revenues and Investment Banking Fees since 2000.

- Ranked #2 in Investment Banking Fees during 2005, according to Dealogic.

- Ranked #1 in Global Syndicated Loans, #1 in Global High Yield Corporate Bonds, #2 in Global Investment Grade Corporate Bonds, and #3 in Global Announced M&A, according to Thomson Financial for 2005.

- Ranked #1 U.S. CMBS Bookrunner and #2 Global CMBS Bookrunner, according to Thomson Financial for 2005.

- Average loans of $62.3 billion were up by $4.0 billion from the prior quarter.

- Allowance for loan losses to average loans was 1.9% for the current quarter; nonperforming assets were $645 million, down 46% from the prior year.

- Return on equity was 13% for the quarter and 18% for 2005.

RETAIL FINANCIAL SERVICES (RFS)

\* \* \*

Discussion of Results:

Operating earnings of $803 million were up by $28 million, or 4%, from the prior year. The increase reflected improved MSR risk management results and lower expenses due to merger-related expense savings and other efficiencies. These benefits were offset partially by a $120 million net loss associated with a transfer of

$3.3 billion of adjustable rate mortgage loans to held-for-sale and a prior-year net benefit related to the sale of the manufactured home loan portfolio. Additionally, narrower spreads on loans and deposits offset the benefit of growth in these balances.

Net revenue of $3.6 billion was up by $49 million, or 1%, from the prior year. Net interest income of $2.5 billion declined by $170 million, or 6%. The decline was related to the sale of loan portfolios in late 2004 and early 2005 and spread compression on loans and deposits. These decreases were offset partially by higher home equity and deposit balances. Noninterest revenue of $1.1 billion was up by $219 million, or 25%. The improvement was largely driven by an increase of $236 million in MSR risk management revenue to $49 million and higher automobile operating lease income, offset in part by the loss on the transfer of mortgage loans to held-for-sale.

The provision for credit losses was $158 million, up by $80 million from the prior year. Prior-year results included a release of the allowance for loan losses related to the sale of the manufactured home loan portfolio. Excluding this release, the provision was flat to the prior year. ***Results continue to reflect lower net charge-offs, good credit quality trends across all business segments and the benefit of certain portfolios in run-off.***

Noninterest expense was $2.1 billion, down by $74 million, or 3%, from the prior year. The reduction reflected operating efficiencies in nearly all businesses, partially offset by increased depreciation expense on owned automobiles subject to operating leases, and ongoing investments in retail banking distribution and sales.

Home Finance operating earnings were $267 million, up by $28 million from the prior year. Operating earnings for the Prime Production & Servicing segment totaled $61 million, up by $117 million. The improved performance was primarily the result of an increase of $236 million in MSR risk management revenue to $49 million, increased servicing revenue and lower expenses. Improvement in MSR risk management results was due in part to the absence of prior-year securities losses on hedge repositioning.

Operating earnings for the Consumer Real Estate Lending segment totaled $206 million, down by $89 million. Prior-year results included a $95 million net pre-tax benefit associated with the sale of a $4.0 billion manufactured home loan portfolio and a $52 million pre-tax charge related to a transfer of adjustable rate mortgage loans to held-for-sale. Excluding these items and the current period loss associated with the transfer of $3.3 billion of mortgage loans to held-for-sale, earnings were up $12 million. This increase reflected higher loan balances and lower expenses offset partially by loan spread compression due to rising short-term interest rates and a flat yield curve, which contributed to accelerated home equity loan payoffs.

72.     On April 19, 2006, the Individual Defendants caused or allowed JPMorgan to issue a press release announcing its financial results for the first quarter of 2006. According to the press release, JPMorgan reduced its provision for credit losses. Also, the press release stated that "credit quality continued to be favorable across all businesses." In particular, the press release provided as follows:

## INVESTMENT BANK (IB)

\* \* \*

Discussion of Results:

Net income of $850 million was driven by record quarterly revenues of $4.7 billion. Net income declined 36% compared with the prior year due to an increase in the provision for credit losses related to higher loan balances, incremental expense from the adoption of SFAS 123R and higher performance-based compensation. Net income was up 27% from the prior quarter reflecting significantly higher net revenues offset primarily by higher performance-based compensation, an increase in the provision for credit losses due to higher loan balances and incremental expense from the adoption of SFAS 123R.

Net revenue was a record $4.7 billion, up by $512 million, or 12%, compared with the prior year, and up 47% from the prior quarter. Investment banking fees of $1.2 billion were the highest since 2000, up 19% from the prior year. Advisory fees of $389 million, up 48% from last year, were also the highest since 2000. Debt underwriting fees of $569 million were up 18% from the prior year, driven by record loan syndication fees offset partially by lower bond underwriting fees. Equity underwriting fees of $212 million were down 11% from the prior year, reflecting lower market share. Fixed Income Markets revenue of $2.0 billion was down 13% from the prior year due to weaker performance in commodities and rates markets, partially offset by stronger results in emerging markets, currencies and credit markets. Equity Markets produced record revenues of $1.2 billion in the quarter driven by record trading and strong commissions across all regions. Credit Portfolio revenues of $321 million were down 8% from the prior year.

The provision for credit losses was $183 million, as compared with a benefit of $366 million in the prior year and an $83 million benefit in the prior quarter. *The current quarter's provision reflects growth in loan balances and stable credit quality.*

Noninterest expense was $3.2 billion, up 26% from the prior year. Excluding incremental expense of $256 million from the adoption of SFAS 123R, expenses were up by $408 million, or 16%, from the prior year. The increase was primarily due to higher incentive compensation related to improved performance, and an increase in the compensation expense to total net revenue ratio, as well as continued investments in strategic initiatives.

Highlights Include:

- Ranked #1 in Global Syndicated Loans, #2 in Global Long-Term Debt, #2 in Global Debt, Equity and Equity-Related and #3 in Global Announced M&A, year-to-date March 31, 2006, according to Thomson Financial.

- Moved up to #5 from #10 in 2005 in Global Asset-Backed Securities and retained our #1 position in U.S. Commercial Mortgage-Backed Securities, year-to-date March 31, 2006, according to Thomson Financial.

- Average loans retained of $53.7 billion were up by $5.5 billion from the prior quarter.

- Allowance for loan losses to average loans was 2.08% for the current quarter; nonperforming assets were $484 million, down 54% from the prior year and down 25% from the prior quarter.

- Return on Equity was 17%.

- Announced strategic alliance with Fidelity Investments to be the exclusive provider of new issue equity and primary provider of fixed-income products to Fidelity's brokerage clients and retail customers.

RETAIL FINANCIAL SERVICES (RFS)

* * *

Discussion of Results:

Net income of $881 million was down by $107 million, or 11%, from the prior year. Current and prior period results included charges to transfer automobile loans to held-for-sale and prior-year results also included a charge for the termination of an Education Finance joint venture and a gain on the sale of a recreational vehicle loan portfolio. Excluding all of these items, net income declined by $131 million or 13%. The decrease reflected weakness in Mortgage Banking and continued spread compression on deposits and loans in Regional Banking, as well as continued investment in the retail distribution network. These declines were offset partially by deposit and loan balance growth in Regional Banking and *continued favorable credit quality in all loan portfolios.*

Net revenue of $3.8 billion was down by $84 million, or 2%, from the prior year. Net interest income of $2.6 billion declined by $91 million, or 3%, reflecting narrower spreads on deposits and loans in Regional Banking as well as reduced balances in the auto loan and lease portfolios. These decreases were offset partially by increased deposit balances and higher levels of home equity loans. Noninterest revenue of $1.2 billion was up by $7 million, or 1%, driven by higher automobile operating lease income and increased fee income on deposit-related products. These increases were offset by lower Mortgage Banking production and servicing income. Current quarter results also included a $50 million write-down on $1.3 billion of automobile loans transferred to held-for-sale, compared with an $88 million write-down last year on $2.7 billon of auto loans transferred to held-for-sale.

*The provision for credit losses totaled $85 million, down by $9 million from the prior year. Credit quality continued to be favorable across all businesses.*

73.    On July 19, 2006, the Individual Defendants caused or allowed JPMorgan to issue a press release announcing its second quarter 2006 results. The press release stated that the Company's results benefited from low consumer and wholesale credit losses and that growth was generated through mortgage originations. JPMorgan's CEO, defendant Dimon, is quoted as saying: "Earnings

also benefited from the extremely favorable consumer and wholesale credit environment ...." The

press release stated in relevant part:

JPMORGAN CHASE REPORTS RECORD NET INCOME
OF $3.5 BILLION, OR $0.99 PER SHARE, FOR
THE SECOND QUARTER OF 2006

- Investment Bank generates record fees and solid markets results

- Results benefit from low consumer and wholesale credit losses

- Strong Card Services earnings on continued low bankruptcy losses

- Asset & Wealth Management and Treasury & Securities Services post record revenue and earnings driven by strong underlying growth

- Retail Financial Services generates growth in checking accounts, credit cards and mortgage originations

JPMorgan Chase & Co. today reported 2006 second-quarter net income of $3.5 billion, or $0.99 per share, compared with net income of $1.0 billion, or $0.28 per share, for the second quarter of 2005. The comparison with the prior year benefited from the absence of a litigation reserve charge of $1.2 billion after-tax, or $0.33 per share. Results for the quarter included the following items, all of which are included in the Corporate segment results:

* * *

Jamie Dimon, Chief Executive Officer, said, "This quarter we posted record earnings driven by positive momentum across the firm, with almost all of our businesses generating growth in key production metrics and volumes due to continued investments in sales staff, products, branches and systems. *Earnings also benefited from the extremely favorable consumer and wholesale credit environment*, which is not expected to continue. Our Investment Bank generated record fees, including record debt and equity underwriting fees and good markets results. In addition, we saw continued progress in the Corporate segment. Firmwide expenses reflect our ongoing progress in funding growth through disciplined expense management."

Dimon added that the firm is on target to complete the New York Tri-State retail conversion during the third quarter of this year, noting that "customers are already seeing the benefits of refurbished branches, more ATMs and upgraded systems. Once this conversion is complete, we will redirect resources to converting The Bank of New York branches that we are acquiring. We expect to close this transaction in the fourth quarter, with rebranding and systems conversion completed in the second quarter of 2007. We remain very excited by this opportunity to strategically expand our New York Tri-State franchise and to provide added convenience for our customers."

-26-

74.     On October 18, 2006, the Individual Defendants caused or allowed the Company to issue a press release detailing its third quarter results for the 2006 fiscal year. Defendant Dimon commented in the press release that "[w]e are pleased with our results, as earnings improved substantially versus the prior year. It is gratifying that our focus on improving each of our businesses is becoming evident ...." In particular, the press release stated:

**JPMORGAN CHASE REPORTS NET INCOME OF $3.3 BILLION,
OR $0.92 PER SHARE, FOR THE THIRD QUARTER OF 2006**

- Investment Bank generates record fees and strong market results

- Asset & Wealth Management and Treasury & Securities Services generate double-digit earnings growth

- ***Results continue to benefit from favorable credit environment***

- New York Tri-state consumer conversion successfully completed

- Completed the acquisition of The Bank of New York's retail business on October 1st

JPMorgan Chase & Co. today reported 2006 third-quarter net income of $3.3 billion, or $0.92 per share compared with net income of $2.5 billion, or $0.71 per share, for the third quarter of 2005. The prior-year quarter includes a special provision for credit losses related to Hurricane Katrina of $248 million after-tax, or $0.07 per share. In addition, after-tax merger expenses of $30 million and $137 million were recorded in each period, respectively.

Jamie Dimon, Chief Executive Officer, said, "We are pleased with our results, as earnings improved substantially versus the prior year. It is gratifying that our focus on improving each of our businesses is becoming evident, although we still have much work to do. Earnings benefited from record Investment Banking fees and strong markets results as well as from continued improvement in the Corporate segment. Retail Banking's performance was affected by weak results in Mortgage Banking. Key business drivers, such as assets under management, assets under custody, credit card accounts and sales volume, checking accounts and loans, all showed continued momentum. Our overall results continue to benefit from a favorable credit environment, which we do not expect to continue. We continue to focus our business planning around a return to normal, or even adverse, credit conditions across all our businesses."

Commenting on other developments, Mr. Dimon noted, "We successfully completed our New York Tri-state consumer conversion, which was one of the most complex conversions ever in the banking industry and a critical milestone for achieving our merger efficiency goal. We now have linked over 2,600 branches in 17 states on a common systems platform. The effort, dedication and teamwork of the conversion team now will be turned toward the recently acquired Bank of New York branches, which will be converted and refurbished beginning in the spring of 2007."

75.     On January 17, 2007, the Individual Defendants caused or allowed the Company to issue a press release detailing its fourth quarter results for the 2006 fiscal year. The press release attempted to downplay the impact of the subprime mortgage crisis, stating "[t]he provision for credit losses of $262 million was up by $104 million from the prior year, primarily due to the establishment of additional allowance for loan losses related to loans acquired from The Bank of New York, increased net charge-offs (reflecting portfolio seasoning and some deterioration in subprime mortgage) and a change in the timing of loss recognition in Auto Finance." Also, the press release stated that "credit quality remained stable." In particular, the press release stated:

> JPMorgan Chase & Co. today reported 2006 fourth-quarter net income of $4.5 billion, or $1.26 per share, compared with net income of $2.7 billion, or $0.76 per share, for the fourth quarter of 2005. Reported results include a $622 million after-tax gain related to exiting the corporate trust business in the fourth quarter of 2006. Income from continuing operations was $3.9 billion, or $1.09 per share, in the current quarter compared with $2.6 billion, or $0.74 per share, for the fourth quarter of 2005. Current-quarter results also include $359 million of benefits related to tax audit resolutions and after-tax merger expense of $62 million.

> Jamie Dimon, Chairman and Chief Executive Officer, said, "During the fourth quarter, we posted both record revenue and income from continuing operations, reflecting increasingly strong results across most of our businesses, especially in investment banking, where fees were at a record level and markets results improved significantly from the prior year. Corporate segment results also continued to improve. Overall in 2006 we achieved a number of important milestones: we successfully completed the New York Tri-state consumer conversion as well as many other key integration projects; we announced and closed the exchange of our corporate trust business for the consumer and middle-market franchise of The Bank of New York; and we continued to invest in and grow each of our businesses."

> Commenting on 2007, Dimon added, "The firm is focused on driving improvement in performance through both continued cost discipline and investment in all areas of our franchise; converting and integrating The Bank of New York branches; and completing the wholesale deposit conversion, which is the last significant integration activity related to the Bank One merger."

* * *

INVESTMENT BANK (IB)

* * *

Discussion of Results:

> Net income of $1.0 billion increased by $342 million, or 51%, compared with the prior year. Earnings growth reflected record revenue, primarily offset by higher expense and the lack of a benefit from the provision for credit losses. Compared with

-28-

the prior quarter, net income increased by $33 million, or 3%, reflecting higher revenue and lower expense, primarily offset by a higher provision for credit losses.

Net revenue was $4.7 billion, up 48% from the prior year, driven by record investment banking fees and improved markets results. Investment banking fees of $1.6 billion were up 36% from the prior year driven by debt underwriting and advisory fees, both of which were at record levels. Debt underwriting fees of $771 million were up 51% driven by record loan syndication and strong bond underwriting fees. Advisory fees of $482 million were up 41%, which reflected strength across regions. Both debt underwriting and advisory performance benefited from high levels of corporate and financial sponsor activity in the quarter. Equity underwriting fees of $327 million were up 5% reflecting strength in common stock offerings in Europe and the Americas. Fixed Income Markets revenue of $2.0 billion was up 77% from a weak prior-year quarter with improved performance in credit markets, currencies, and emerging markets, partially offset by lower results in securitized products. Compared with the prior quarter, Fixed Income Markets were down 17% from a strong prior quarter due to weaker commodities. Equity Markets revenue of $909 million nearly doubled from the prior year on strength in cash equities and equity derivatives and reflected strong performance across regions. Credit Portfolio revenue of $263 million was down 43%, largely reflecting lower gains from loan workouts.

Provision for credit losses was $63 million for the quarter compared with a benefit of $83 million in the prior year. The current-period provision continues to reflect portfolio activity. *Credit quality remained stable.*

Noninterest expense was $3.1 billion, up by $903 million, or 42%, from the prior year. This increase was due primarily to higher performance-based compensation.

Highlights Include:

- Ranked #1 in Investment Banking Fees for full-year 2006 based upon revenue, according to Dealogic.

- Ranked #2 in Announced M&A in the Europe, Middle East and Africa region based upon volume, according to Dealogic.

- Named Risk magazine's 2006 Energy House of the Year and IFR Global Interest Rates and Commodities House of the Year.

- Total average loans of $84.7 billion were up by $20.9 billion, or 33%, from the prior year and down by $1.0 billion, or 1%, from the prior quarter. Average loans retained of $60.9 billion were up by $12.5 billion, or 26%, from the prior year and down by $0.7 billion, or 1%, from the prior quarter. Average loans held-for-sale of $23.7 billion were up by $8.4 billion, or 54%, from the prior year and down by $0.3 billion, or 1%, from the prior quarter.

- Allowance for loan losses to average loans was 1.73% for the current quarter, down from 1.87% in the prior year; nonperforming assets

were $269 million, down 58% from the prior year and down 41% from the prior quarter.

- Return on Equity was 19% on $21 billion of allocated capital.

\* \* \*

RETAIL FINANCIAL SERVICES (RFS)

\* \* \*

Discussion of Results:

Net income of $718 million was down by $85 million, or 11%, from the prior year. Results were impacted by the following items, which are all reported in the Regional Banking segment: a current quarter pre-tax net loss of $215 million compared with a prior year pre-tax net loss of $120 million due to mortgage loans transferred to held-for-sale; the acquisition of The Bank of New York's consumer banking business on October 1, 2006; and the absence of the insurance business, which was sold on July 1, 2006.

Net revenue of $3.7 billion was up by $134 million, or 4%, from the prior year. Net interest income of $2.6 billion was up 4% due to The Bank of New York transaction and the acquisition of Collegiate Funding Services, higher deposit and home equity loan balances in Regional Banking, and wider loan spreads in Auto Finance. These benefits were offset partially by the sale of the insurance business in the third quarter of 2006, lower auto loan and lease balances, and narrower spreads on deposits and loans in Regional Banking. Noninterest revenue of $1.1 billion was up by $36 million, or 3%, including the impact in Regional Banking of a $233 million current-quarter loss, compared with a $120 million prior-year loss, both related to mortgage loans transferred to held-for-sale. Results benefited from increases in deposit-related and branch production fees, higher automobile operating lease revenue and The Bank of New York transaction. These benefits were offset partially by the sale of the insurance business.

*The provision for credit losses of $262 million was up by $104 million from the prior year, primarily due to the establishment of additional allowance for loan losses related to loans acquired from The Bank of New York, increased net charge-offs (reflecting portfolio seasoning and some deterioration in subprime mortgage) and a change in the timing of loss recognition in Auto Finance.*

76.    On April 18, 2007, the Individual Defendants caused or allowed the Company to issue a press release detailing its first quarter financial results for the 2007 fiscal year. The Individual Defendants again attempted to downplay the impact the subprime crisis would have on the Company, referring to JPMorgan's exposure as "manageable" and focusing on other aspects of the Company. In particular the press release stated:

- Investment Bank generates record earnings of $1.5 billion on record revenue of $6.3 billion; record fixed income and equity markets results and investment banking fees

-30-

- Asset Management and Commercial Banking produce record earnings; Private Equity posts very strong results

- Retail Financial Services successfully completed the systems conversion and rebranding for 339 former Bank of New York branches; branch sales volumes continue to grow

JPMorgan Chase & Co. today reported 2007 first-quarter net income of $4.8 billion, or $1.34 per share, compared with net income of $3.1 billion, or $0.86 per share, for the first quarter of 2006. Income from continuing operations was $4.8 billion, or $1.34 per share, in the current quarter compared with $3.0 billion, or $0.85 per share, for the first quarter of 2006. The firm's adoption of SFAS 157 ("Fair Value Measurements") resulted in a benefit to the current quarter's earnings of $391 million¹ (after-tax), or $0.11 per share.

Jamie Dimon, Chairman and Chief Executive Officer, commenting on the quarter said, *"We are very pleased with our record results this quarter, which reflected the strength of our broad and diversified franchise. Across all of our businesses, we experienced continued growth in client volumes, including new accounts, loans, deposits and new business.* The Investment Bank, Asset Management and Commercial Banking each delivered record earnings. Private equity gains were also very strong. *The firm's strong results include some benefit from the generally favorable credit environment, which we do not expect to continue indefinitely."* Commenting on The Bank of New York branch integration, Dimon noted, "Through the remarkable efforts of thousands of dedicated employees, we now have an integrated and much stronger retail banking business in the New York Tri-state area. Across the U.S. our customers now have available to them the convenience of more than 3,000 branches and 8,500 ATMs."

The firm also announced the following actions taken by its Board of Directors:

- Declared a quarterly dividend of $0.38 per share on the corporation's common stock, an increase of $0.04 per share, or 12%. The dividend is payable on July 31, 2007, to stockholders of record at the close of business on July 6, 2007.

- Authorized a new $10 billion common stock repurchase program, replacing the prior $8 billion program that had approximately $850 million of remaining authorization.

Remarking on the dividend and stock repurchase announcements, Dimon said, "Given the substantial improvement in the level and quality of earnings over the past several years, we are pleased the Board of Directors announced the first dividend increase in six years and a new $10 billion stock repurchase program."

\* \* \*

INVESTMENT BANK (IB)

\* \* \*

Discussion of Results:

Net income was a record $1.5 billion, up by $690 million, or 81%, compared with the prior year and up by $531 million, or 53%, compared with the prior quarter.

Earnings growth reflected record revenue and a lower provision for credit losses, partially offset by higher noninterest expense.

Net revenue was a record $6.3 billion, up 30% from the prior year, driven by record investment banking fees and record markets results. Investment banking fees of $1.7 billion were up 48% from the prior year driven by record debt and record equity underwriting as well as strong advisory fees. Debt underwriting fees of $864 million were up 52% driven by record bond underwriting fees and strong loan syndication fees, which benefited from both leveraged and high grade issuance. Advisory fees of $472 million were up 21%, with particular strength in the Americas. Equity underwriting fees of $393 million were up 85%, reflecting strength in common stock and convertible offerings in the Americas and Europe. Record Fixed Income Markets revenue of $2.6 billion was up 25% from the prior year, benefiting from improved results in commodities (compared with a weak prior-year quarter) as well as strength in credit and rate markets, partially offset by lower results in currencies. Record Equity Markets revenue of $1.5 billion increased 22%, benefiting from particularly strong performance in Europe as well as strong derivatives performance across regions. Credit Portfolio revenue of $394 million was up 23%, due to the incorporation of an adjustment to the valuation of the firm's derivative liabilities measured at fair value that reflects the credit quality of the firm, in conjunction with SFAS 157 ("Fair Value Measurements"), and higher trading revenue from hedging activities, partially offset by lower gains from loan workouts.

Provision for credit losses was $63 million compared with $183 million in the prior year. The prior-year provision reflected growth in the loan portfolio.

Noninterest expense was $3.8 billion, up by $511 million, or 15%, from the prior year. This increase was due to higher compensation expense, primarily performance-based, partially offset by the absence of expense from the adoption of SFAS 123R in the prior-year quarter.

Highlights Include:

- Ranked #1 in both Global and U.S. Equity and Equity-Related for the first time ever; #1 in Global Syndicated Loans; #2 in Global Announced M&A; #2 in Global Debt, Equity and Equity-Related; and #2 in Global Long-Term Debt based upon volume, according to Thomson Financial for year-to-date March 31, 2007.

- Total average loans of $72.7 billion were flat from the prior year and down by $12.0 billion, or 14%, from the prior quarter.

  - Average loans retained of $59.9 billion were up by $6.2 billion, or 12%, from the prior year and down by $1.1 billion, or 2%, from the prior quarter.

  - Average loans held-for-sale of $12.8 billion were down by $6.4 billion, or 33%, from the prior year and down by $11.0 billion, or 46%, from the prior quarter.

  - Approximately $12.0 billion of held-for-sale loans were reclassified to trading assets as a result of the adoption of SFAS 159 ("Fair Value Option").

-32-

- Allowance for loan losses to average loans was 1.76% for the current quarter, down from 2.08% in the prior year; nonperforming assets were $128 million, down 74% from the prior year and down 52% from the prior quarter.

- Return on equity was 30% on $21 billion of allocated capital.

* * *

RETAIL FINANCIAL SERVICES (RFS)

* * *

Discussion of Results:

Net income of $859 million was down by $22 million, or 2%, from the prior year.

Net revenue of $4.1 billion was up by $343 million, or 9%, from the prior year. Net interest income of $2.6 billion was up 2% due to The Bank of New York transaction, higher home equity loans and deposit balances in Regional Banking, and wider loan spreads in Auto Finance. These benefits were offset partially by lower prime and subprime mortgage balances, the sale of the insurance business, lower auto loan and lease balances, and narrower spreads on deposits. Noninterest revenue of $1.5 billion was up by $288 million, or 24%. Results benefited from higher gain-on-sale income and the reclassification of certain loan origination costs to expense (previously netted against revenue) due to the adoption of SFAS 159 ("Fair Value Option") in Mortgage Banking; increases in deposit—related fee revenue; The Bank of New York transaction; and higher automobile operating lease revenue. These benefits were offset partially by the sale of the insurance business, a charge resulting from accelerated surrenders of customer annuity contracts, and the absence of a prior-year loss related to auto loans transferred to held-for-sale.

The provision for credit losses of $292 million was up by $207 million from the prior year. This increase was due to higher losses in the subprime mortgage portfolio and, to a lesser extent, increased provision in the home equity portfolio related to weaker housing prices. These increases were offset partially by the reversal of a portion of the reserves related to Hurricane Katrina. *The firm's exposure to subprime mortgages is deemed manageable*, with current quarter outstandings of $9.0 billion and net charge-offs of $20 million (0.92% net charge-off rate), compared with $15.1 billion of loans and net charge-offs of $9 million (0.26% net charge-off rate) in the prior-year quarter. Given the firm's current expectations for continued poor loss experience in subprime mortgages, the provision for credit losses was increased and standards for underwriting were tightened this quarter. In addition, since weaker home prices are expected to continue to affect losses in the home equity portfolio, underwriting standards were tightened and the allowance for this portfolio was increased during the quarter.

Noninterest expense of $2.4 billion was up by $169 million, or 8%, primarily due to The Bank of New York transaction, the reclassification of certain loan origination costs due to the adoption of SFAS 159, investments in the retail distribution network and higher depreciation expense on owned automobiles subject to operating leases. These increases were offset partially by the sale of the insurance business.

## THE TRUTH BEGINS TO EMERGE

77.     On July 18, 2007, the Company issued a press release announcing its second quarter

2007 earnings.  While in previous press releases the Individual Defendants caused or allowed

JPMorgan to report that the Company was benefiting from favorable credit conditions, this press

release revealed that the provision for credit losses was almost 6 times higher than the same quarter

the previous year.  The Individual Defendants, however, continued to obscure the effect the subprime

market crisis was having on the Company.  For example, the press release quoted defendant Dimon

stating, "[a]lthough we remain at a relatively benign point of the credit cycle, we continue to focus on

being prepared for a less favorable environment. Given the diversity of our business mix, improving

operating margins across our businesses and the strength of our balance sheet, the firm is well-

positioned for the future."  The press release stated in relevant part:

> JPMorgan Chase & Co. today reported 2007 second-quarter net income of
> $4.2 billion compared with net income of $3.5 billion for the second quarter of 2006.
> Earnings per share of $1.20 were up 21% compared with $0.99 per share in the
> second quarter of 2006.
>
>     Commenting on the quarter, Jamie Dimon, Chairman and Chief Executive
> Officer, said, "We are pleased with our strong financial results driven by continued
> investment in all of our businesses and organic growth. Our strong earnings benefited
> from solid performance in the Investment Bank, record results in Asset Management
> and Treasury & Securities Services, and very strong results in Private Equity. In
> addition, during the quarter we strengthened our reserve for the home equity lending
> portfolio. *Although we remain at a relatively benign point of the credit cycle, we
> continue to focus on being prepared for a less favorable environment. Given the
> diversity of our business mix, improving operating margins across our businesses
> and the strength of our balance sheet, the firm is well-positioned for the future.*"
>
> * * *
>
> INVESTMENT BANK (IB)
>
> * * *
>
> Discussion of Results:
>
>     Net income was $1.2 billion, up by $340 million, or 41%, compared with the
> prior year. The increase reflected strong revenue growth, primarily offset by an
> increase in noninterest expense, primarily driven by performance-based
> compensation, as well as an increase in the provision for credit losses.
>
>     Net revenue was $5.8 billion, up by $1.5 billion, or 34%, from the prior year,
> driven by record investment banking fees and strong markets results. Investment
> banking fees of $1.9 billion were up 39% from the prior year, driven by record

advisory fees, strong debt underwriting fees and record equity underwriting fees. Debt underwriting fees of $831 million were up 27%, driven by record loan syndication fees. Advisory fees of $560 million were up 59%, benefiting from strong performance across all regions. Equity underwriting fees of $509 million were up 40%, reflecting strong performance in Asia and Europe. Fixed Income Markets revenue increased 15% from the prior year, to $2.4 billion, driven by strong results across most products, partially offset by weaker commodities performance versus a strong prior-year quarter. Equity Markets revenue of $1.2 billion more than doubled from the prior year, benefiting from strong global derivatives and cash equities trading performance. Credit Portfolio revenue of $204 million was down 18% due largely to lower gains from loan sales and workouts.

Provision for credit losses was $164 million compared with a benefit of $62 million in the prior year. The increase in the allowance for credit losses reflects portfolio activity. Allowance for loan losses to average loans was 1.76% for the current quarter, which was flat compared with the prior year; nonperforming assets were $119 million, down 77% from the prior year and down 7% from the prior quarter.

Noninterest expense was $3.9 billion, up by $763 million, or 25%, from the prior year. This increase was due primarily to higher performance-based compensation expense.

Highlights Include:

- Ranked #1 in Global Equity and Equity-Related; #1 in Global Syndicated Loans; #4 in Global Announced M&A; #2 in Global Debt, Equity and Equity-Related; and #2 in Global Long-Term Debt based upon volume, according to Thomson Financial for year-to-date June 30, 2007.

- Total average loans of $73.9 billion were down 6% from the prior year and up 2% from the prior quarter.

  - Average loans retained of $60.3 billion were up 2% from the prior year and up 1% from the prior quarter.

  - Average loans held-for-sale of $13.5 billion were down 32% from the prior year, primarily due to the SFAS 159 ("Fair Value Option") reclassification of loans from loans held-for-sale to trading assets, and up 6% from the prior quarter.

- Return on equity was 23% on $21.0 billion of allocated capital.

RETAIL FINANCIAL SERVICES (RFS)

* * *

Discussion of Results:

Net income of $785 million was down by $83 million, or 10%, from the prior year, as declines in Regional Banking and Auto Finance were offset partially by improved results in Mortgage Banking.

Net revenue of $4.4 billion was up by $578 million, or 15%, from the prior year. Net interest income of $2.7 billion was up by $107 million, or 4%, due to The Bank of New York transaction and higher deposit balances. These benefits were offset partially by the sale of the insurance business and a continued shift to narrower-spread deposit products. Noninterest revenue of $1.7 billion was up by $471 million, or 39%, benefiting from increased mortgage loan originations; increases in deposit-related fees; increased mortgage loan servicing revenue; and The Bank of New York transaction. Noninterest revenue also benefited from the classification of certain mortgage loan origination costs as expense (loan origination costs previously netted against revenue are currently recorded as expense) due to the adoption of SFAS 159 ("Fair Value Option") in the first quarter of 2007. These benefits were offset partially by the sale of the insurance business.

***The provision for credit losses was $587 million compared with $100 million in the prior year. The increase in provision reflects weak housing prices in select geographic areas and the resulting increase in estimated losses for high loan-to-value home equity loans, especially those originated through the wholesale channel.*** Home equity underwriting standards were further tightened during the quarter, and pricing actions were implemented to reflect elevated risks in this segment. The current-quarter provision includes an increase in the allowance for loan losses related to home equity loans of $329 million. Home equity net charge-offs were $98 million (0.44% net charge-off rate) in the current quarter compared with net charge-offs of $30 million (0.16% net charge-off rate) in the prior year.

Noninterest expense of $2.5 billion was up by $225 million, or 10%, due to The Bank of New York transaction, the classification of certain loan origination costs as expense due to the adoption of SFAS 159, an increase in loan originations in Mortgage Banking, and investments in retail distribution. These increases were offset partially by the sale of the insurance business.

78.    On October 17, 2007, the Company issued a press release detailing its third quarter results for the 2007 fiscal year. In this press release the Company admitted it had "markdowns of $1.3 billion (net of fees) on leveraged lending funded and unfunded commitments and markdowns of $339 million (net of hedges) on collateralized debt obligation (CDO) warehouses and unsold positions." The press release stated in relevant part:

JPMORGAN CHASE REPORTS THIRD-QUARTER 2007 NET INCOME OF $3.4 BILLION; EARNINGS PER SHARE OF $0.97, UP 5% FROM THE PRIOR YEAR

- Investment Bank results declined, reflecting markdowns of $1.3 billion (net of fees) on leveraged lending funded and unfunded commitments and weaker trading performance

- Retail Financial Services delivered 18% revenue growth; however, earnings declined 14% affected by a net $306 million increase in reserves for home equity loans

- Record earnings and revenue generated by Asset Management and Treasury & Securities Services

- Card Services and Commercial Banking produced double-digit earnings growth; Private Equity posted strong results

- Wholesale deposit conversion and Card Services in-sourcing of processing platform successfully completed

- Capital remains strong, with Tier 1 capital ratio of 8.4% (estimated); wholesale and consumer loan loss reserves increased

JPMorgan Chase & Co. today reported 2007 third-quarter net income of $3.4 billion, up from $3.3 billion in the third quarter of 2006. Earnings per share of $0.97 were up 5%, compared with $0.92 per share in the third quarter of 2006.

Commenting on the quarter, Jamie Dimon, Chairman and Chief Executive Officer, said, "Our firm performed well overall in the third quarter, despite challenging credit and market conditions. Asset Management and Treasury & Securities Services delivered record earnings, Card Services and Commercial Banking produced double-digit earnings growth, and Private Equity posted another quarter of strong gains. Investment banking is a volatile business, and while we would typically expect lower earnings in the Investment Bank during a difficult market environment, such as this one, we still believe that our performance could have been a bit better. Finally, Retail Financial Services had good revenue growth while further strengthening its reserves for home equity loan losses."

Remarking further, Dimon said, "It is gratifying that even in this challenging environment, the firm generated record revenue, net income and earnings per share for a third-quarter and year-to-date, while maintaining a fortress balance sheet and improving the infrastructure of the firm. During the quarter, we did not lose focus on becoming more efficient, as we successfully completed the in-sourcing of our credit card processing platform and our conversion of the wholesale deposit system. The wholesale conversion — the largest in the firm's history and the last significant merger integration event — affected approximately $180 billion in customer balances."

Discussing the firm's outlook, Dimon said, "We are comfortable that we are building an increasingly strong company, which can capitalize on opportunities in any environment, due to actions taken over the past few years, including:

- Strengthening our levels of capital, reserves and liquidity.

- Investing in all our businesses, which has:

  - strengthened the quality and diversity of earnings; and

-37-

- improved our operating systems, cost structure and operating margins."

Dimon further added, "We remain cautious about the future economic environment, but will continue to make investments based upon the long-term outlook for market and client volumes. Our focus will be on investments in areas across our franchise, including the Investment Bank and the retail mortgage business, where we can wisely utilize our balance sheet to better serve our clients and gain market share in the process. I believe our firm is well positioned for the future."

INVESTMENT BANK (IB)

\* \* \*

Discussion of Results:

Net income was $296 million, down by $680 million, or 70%, compared with the prior year. The decrease in earnings reflected lower net revenue as well as a higher provision for credit losses, partially offset by lower noninterest expense.

Net revenue was $2.9 billion, down by $1.9 billion, or 39%, from the prior year. Investment banking fees were $1.3 billion, down by 6% from the prior year, reflecting lower debt underwriting fees offset partially by record advisory fees. Debt underwriting fees were $468 million, down 34%, reflecting lower bond underwriting and loan syndication fees, which were negatively affected by market conditions. Advisory fees were $595 million, up 36%, driven by a strong performance across all regions. Equity underwriting fees were $267 million, down 3%, driven by lower revenue in Europe and Asia, partially offset by strong performance in the Americas in common stock and convertible offerings. *Fixed Income Markets revenue was $687 million, down by $1.8 billion, or 72%, from the prior year. The decrease was primarily due to markdowns of $1.3 billion (net of fees) on leveraged lending funded and unfunded commitments and markdowns of $339 million (net of hedges) on collateralized debt obligation (CDO) warehouses and unsold positions.* Fixed Income Markets revenue also decreased due to very weak credit trading performance and significantly lower commodities results, compared with a strong prior-year quarter. These lower results were offset partially by record revenue in both rates and currencies. Equity Markets revenue was $537 million, down 18% from the prior year, as weaker trading results were offset partially by strong client revenue across businesses. Fixed Income Markets and Equity Markets had a combined benefit of $454 million from the widening of the firm's credit spread on certain structured liabilities, with an impact of $304 million and $150 million, respectively. Credit Portfolio revenue was $392 million, up 45% from the prior year, primarily due to higher trading revenue from hedging activities and gains from loan workouts.

The provision for credit losses was $227 million, compared with $7 million in the prior year. The provision was up due to an increase in the allowance for credit losses, primarily related to portfolio growth. Net charge-offs were $67 million, compared with net recoveries of $8 million in the prior year. The allowance for loan losses to average loans retained was 1.80% for the current quarter, an increase from 1.64% in the prior year. Nonperforming assets were $325 million, down 29% from the prior year and up 173% from the prior quarter.

Average loans retained were $61.9 billion, up by $2.9 billion, or 5%, from the prior quarter. Average fair value and held-for-sale loans were $17.3 billion, up by

$2.5 billion, or 17%, from the prior quarter. Fair value and held-for-sale loans at September 30, 2007, were $20.2 billion, up by $8.6 billion, or 76%, from the prior quarter. Both average and end-of-period fair value and held-for-sale loans reflect a net increase in third-quarter, 2007 leveraged lending activity.

Noninterest expense was $2.4 billion, down by $866 million, or 27%, from the prior year. The decrease was due primarily to lower performance-based compensation.

Highlights Include:

- Ranked #1 in Global Equity and Equity-Related; #1 in Global Syndicated Loans; #4 in Global Announced M&A; #2 in Global Debt, Equity and Equity-Related; and #2 in Global Long-Term Debt, based upon volume, according to Thomson Financial for year-to-date September 30, 2007.

- Return on equity was 6% on $21.0 billion of allocated capital.

RETAIL FINANCIAL SERVICES (RFS)

\* \* \*

Discussion of Results:

Net income was $639 million, down by $107 million, or 14%, from the prior year, due to lower results in Regional Banking, primarily due to an increase in the provision for credit losses.

Net revenue was $4.2 billion, up by $646 million, or 18%, from the prior year. Net interest income was $2.7 billion, up by $224 million, or 9%, due to the Bank of New York transaction, wider spreads on loans and higher deposit balances. These benefits were offset partially by a shift to narrower—spread deposit products. Noninterest revenue was $1.5 billion, up by $422 million, or 38%, benefiting from the absence of a prior-year negative valuation adjustment to the MSR asset; increases in deposit-related fees; an increase in mortgage loan originations; a higher level of education loan sales; and increased mortgage loan servicing revenue. Noninterest revenue also benefited from the Bank of New York transaction and the classification of certain mortgage loan origination costs as expense (loan origination costs previously netted against revenue commenced being recorded as an expense in the first quarter of 2007 due to the adoption of SFAS 159 ("Fair Value Option")). These benefits were offset partially by markdowns on the mortgage warehouse and pipeline.

***The provision for credit losses was $680 million, compared with $114 million in the prior year. The current-quarter provision includes a net increase of $306 million in the allowance for loan losses related to home equity loans as continued weak housing prices have resulted in an increase in estimated losses for high loan-to-value loans.*** Home equity net charge-offs were $150 million (0.65% net charge-off rate), compared with $29 million (0.15% net charge-off rate) in the prior year. In addition, the current-quarter provision includes an increase in the allowance for loan losses, reflecting increased loan balances resulting from the decision to retain rather than sell subprime mortgage loans. Subprime mortgage net

charge-offs were $40 million (1.62% net charge-off rate), compared with $13 million (0.36% net charge-off rate) in the prior year.

## THE TRUTH IS FULLY REVEALED

79.    Then, on January 16, 2008, JPMorgan disclosed the full extent of its exposure to the subprime mortgage crisis. Specifically, JPMorgan's third quarter write-down was not nearly large enough and the Company would have to write-down another $1.3 billion due to exposure to subprime loans. The Company's net income fell 21% compared to the same quarter the previous year. JPMorgan's fiscal fourth quarter and full year 2007 earnings press release provided in relevant part:

> *JPMorgan Chase & Co. today reported 2007 fourth-quarter income from continuing operations of $3.0 billion, or $0.86 per share, down 21% compared with $3.9 billion, or $1.09 per share, in the fourth quarter of 2006. For full-year 2007, income from continuing operations was a record $15.4 billion, or $4.38 per share, up 15% compared with $13.6 billion, or $3.82 per share, in 2006.* Reported net income for the fourth quarter of 2007 was $3.0 billion, down from $4.5 billion in the prior year, which included a $622 million gain on the sale of selected corporate trust businesses in the fourth quarter of 2006 that is not included in continuing operations. Reported earnings per share of $0.86 declined from $1.26 per share in the fourth quarter of 2006.
>
> Commenting on 2007 full-year and fourth-quarter results, Jamie Dimon, Chairman and Chief Executive Officer, said, "I am pleased with our company's record results for the year, despite our mixed performance in the fourth quarter. *Our lower quarterly results were affected by the Investment Bank's markdowns in subprime-related positions and weaker trading. In addition, our consumer home equity and subprime loan portfolios performed worse than we expected.*
>
> "The diversified nature of our company helped offset areas of weakness. Asset Management, Treasury & Securities Services, Commercial Banking and Private Equity reported record or near-record revenue and earnings, while investment banking fees had strong growth in the quarter and were at record levels for the year. We also experienced organic growth across Retail Financial Services, with increases in deposits, checking accounts and mortgage originations."
>
> Dimon further remarked, "It is gratifying that we were able to achieve record full-year results while still adding $2.3 billion to our credit reserves (which now total $10 billion); maintaining a strong 8.4% Tier 1 capital ratio; making important investments across the firm; and growing market share."
>
> Looking ahead to 2008, Dimon commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here — for which, as a company, we need to be prepared — it will negatively affect business volumes and drive credit costs higher. However, we feel well-positioned given the investments and actions we have taken over the past few years to improve our businesses' operating margins, create a stronger systems infrastructure and build a fortress balance sheet. Regardless of the economic environment, with this solid foundation in place, we can continue to serve our clients well and build the business for the future."

\* \* \*

INVESTMENT BANK (IB)

\* \* \*

Discussion of Results:

Net income was $124 million, a decrease of $885 million, or 88%, compared with the prior year, reflecting lower net revenue and a higher provision for credit losses, partially offset by lower noninterest expense.

Net revenue was $3.2 billion, a decrease of $1.7 billion, or 35%, from the prior year. Investment banking fees were $1.7 billion, up 5% from the prior year, reflecting record advisory and equity underwriting fees, largely offset by lower debt underwriting fees. Advisory fees were $646 million, up 34%, and equity underwriting fees were $544 million, up 66%; both were driven by strong performance across all regions. Debt underwriting fees of $467 million declined 39%, reflecting lower loan syndication and bond underwriting fees, which were negatively affected by market conditions. *Fixed Income Markets revenue was $615 million, down $1.4 billion, or 70%, from the prior year. The decrease was due to markdowns of $1.3 billion (net of hedges) on subprime positions, including subprime collateralized debt obligations (CDOs).* Fixed Income Markets revenue also decreased due to markdowns in securitized products on non-subprime mortgages and losses in credit trading. These lower results were offset partially by strong revenue in rates and currencies and improved results in commodities compared with a weak prior-year quarter. Equity Markets revenue was $578 million, down 40% from the prior year, as weaker trading results were offset partially by strong client revenue across businesses. Fixed Income Markets and Equity Markets included a combined benefit of $277 million from the widening of the firm's credit spread on certain structured liabilities, with an impact of $154 million and $123 million, respectively. Credit Portfolio revenue was $322 million, up 23% from the prior year, primarily due to higher trading revenue from hedging activities, partially offset by lower gains from loan workouts.

The provision for credit losses was $200 million, compared with $63 million in the prior year. The increase in the provision resulted from a higher allowance for credit losses, primarily related to loan portfolio growth. Net recoveries were $9 million, compared with net charge-offs of $10 million in the prior year. The allowance for loan losses to average loans retained was 1.93% for the current quarter, an increase from 1.73% in the prior year.

Average loans retained were $68.9 billion, an increase of $7.0 billion, or 11%, from the prior quarter. Average fair value and held-for-sale loans were $25.0 billion, up $7.7 billion, or 44%, from the prior quarter due to leveraged lending activity.

Noninterest expense was $3.0 billion, a decrease of $194 million, or 6%, from the prior year. The decrease was due primarily to lower performance-based compensation expense offset partially by higher transaction-related costs, reflecting increased volumes.

Highlights Include:

- Ranked #2 in Global Equity and Equity-Related; #1 in Global Syndicated Loans; #4 in Global Announced M&A; #2 in Global

> Debt, Equity and Equity-Related; and #2 in Global Long-Term Debt, based upon volume, according to Thomson Financial for the year ended December 31, 2007.

- Return on equity was 2% and 15% on $21.0 billion of allocated capital for the fourth quarter and full year 2007, respectively.

## REASONS THE STATEMENTS WERE IMPROPER

80.     JPMorgan's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)     The overall credit conditions were not favorable and would soon take a drastic downturn;

(b)     JPMorgan was more exposed to the subprime market crisis than it had disclosed;

(c)     JPMorgan's portfolio of billions of dollars in subprime mortgage related assets and CDOs would eventually be written-down by billions of dollars; and

(d)     as a result of the foregoing, JPMorgan's public statements regarding its business health and prospects were inaccurate.

## THE IMPROPER BUYBACK

81.     During the Relevant Period, while JPMorgan's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $11.6 billion worth of JPMorgan's shares at an average price of approximately $46.80 per share, which is substantially higher than JPMorgan's share price when its true business health was revealed, dropping JPMorgan's stock to $40 per share, and comparable to the $46.52 per share the defendants averaged in selling their own JPMorgan stock holdings during the Relevant Period. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending crisis. While JPMorgan was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## DAMAGES TO JPMORGAN CAUSED BY THE INDIVIDUAL DEFENDANTS

82.    As a result of the Individual Defendants' improprieties, JPMorgan disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated JPMorgan's credibility as reflected by the Company's $43.8 billion market capitalization loss.

83.    Further, as a direct and proximate result of the Individual Defendants' actions, JPMorgan has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to JPMorgan;

(b)    costs incurred from the $11.6 billion that JPMorgan spent repurchasing its own stock; and

(c)    costs incurred from having to write-down billions of dollars worth of CDOs and other subprime investments.

84.    Moreover, these actions have irreparably damaged JPMorgan's corporate image and goodwill. For at least the foreseeable future, JPMorgan will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that JPMorgan's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### INSIDER SELLING

85.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of JPMorgan's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| ADAMS | 6/30/2006 | 43,032 | $42.50 | $1,828,860.00 |

-43 -

| | | 43,032 | | $1,828,860.00 |
|---|---|---|---|---|
| | | | | |
| BISIGNANO | 10/25/2007 | 36,573 | $45.85 | $1,676,872.05 |
| | | 36,573 | | $1,676,872.05 |
| | | | | |
| BLACK | 1/25/2007 | 42,040 | $50.27 | $2,113,350.80 |
| | 4/20/2007 | 150,000 | $52.22 | $7,833,000.00 |
| | | 192,040 | | $9,946,350.80 |
| | | | | |
| BRADLEY | 5/1/2006 | 13,200 | $45.40 | $599,280.00 |
| | 1/25/2007 | 6,272 | $50.27 | $315,293.44 |
| | 4/20/2007 | 16,006 | $52.40 | $838,714.40 |
| | | 35,478 | | $1,753,287.84 |
| | | | | |
| CAVANAGH | 2/9/2006 | 1,527 | $39.60 | $60,469.20 |
| | 5/1/2006 | 43,542 | $45.38 | $1,975,935.96 |
| | 5/1/2006 | 14,231 | $45.38 | $645,802.78 |
| | 1/16/2007 | 1,581 | $48.08 | $76,014.48 |
| | 1/19/2007 | 3,401 | $48.54 | $165,084.54 |
| | 1/19/2007 | 1,134 | $48.54 | $55,044.36 |
| | 1/25/2007 | 7,160 | $50.27 | $359,933.20 |
| | | 72,576 | | $3,338,284.52 |
| | | | | |
| DIMON | 4/20/2006 | 472,352 | $42.62 | $20,131,642.24 |
| | 4/20/2006 | 380,929 | $42.62 | $16,235,193.98 |
| | 4/20/2006 | 380,929 | $42.62 | $16,235,193.98 |
| | 4/20/2006 | 231,725 | $42.62 | $9,876,119.50 |
| | 1/16/2007 | 13,346 | $48.08 | $641,675.68 |
| | 1/19/2007 | 28,342 | $48.54 | $1,375,720.68 |
| | | 1,507,623 | | $64,495,546.06 |
| | | | | |
| DREW | 10/19/2006 | 30,284 | $46.80 | $1,417,291.20 |
| | 10/25/2006 | 7,216 | $47.15 | $340,234.40 |
| | 1/25/2007 | 47,082 | $50.27 | $2,366,812.14 |
| | 5/8/2007 | 297,125 | $52.44 | $15,581,235.00 |
| | 5/8/2007 | 135,026 | $52.44 | $7,080,763.44 |
| | 5/8/2007 | 41,634 | $52.44 | $2,183,286.96 |
| | 5/11/2007 | 82,326 | $51.93 | $4,275,189.18 |
| | | 640,693 | | $33,244,812.32 |
| | | | | |
| HARRISON | 8/7/2006 | 82,158 | $45.09 | $3,704,504.22 |
| | 10/13/2006 | 79,753 | $48.10 | $3,836,119.30 |
| | 12/29/2006 | 30,277 | $48.58 | $1,470,856.66 |
| | | 192,188 | | $9,011,480.18 |
| | | | | |
| MACLIN | 8/14/2006 | 24,271 | $44.11 | $1,070,593.81 |
| | 10/24/2006 | 20,000 | $47.05 | $941,000.00 |
| | 1/22/2007 | 21,000 | $49.84 | $1,046,640.00 |
| | 1/25/2007 | 19,898 | $50.27 | $1,000,272.46 |
| | 5/4/2007 | 37,969 | $52.82 | $2,005,522.58 |

|  | 5/11/2007 | 10,000 | $52.21 | $522,100.00 |
|---|---|---|---|---|
|  |  | 133,138 |  | $6,586,128.85 |
|  |  |  |  |  |
| MANDELBAUM | 5/15/2006 | 94,722 | $44.32 | $4,198,079.04 |
|  | 7/1/2006 | 55,941 | $42.50 | $2,377,492.50 |
|  | 9/15/2006 | 15,983 | $47.06 | $752,159.98 |
|  | 11/15/2006 | 120,055 | $47.33 | $5,682,203.15 |
|  | 1/20/2007 | 11,754 | $48.54 | $570,539.16 |
|  | 1/25/2007 | 10,047 | $50.27 | $505,062.69 |
|  | 5/15/2007 | 72,261 | $52.36 | $3,783,585.96 |
|  | 5/15/2007 | 64,426 | $52.36 | $3,373,345.36 |
|  | 5/15/2007 | 34,496 | $52.36 | $1,806,210.56 |
|  | 5/15/2007 | 34,420 | $52.36 | $1,802,231.20 |
|  | 5/15/2007 | 30,981 | $52.36 | $1,622,165.16 |
|  |  | 545,086 |  | $26,473,074.76 |
|  |  |  |  |  |
| MCDAVID | 5/4/2006 | 61,260 | $45.66 | $2,797,131.60 |
|  | 5/5/2006 | 13,740 | $46.42 | $637,810.80 |
|  | 5/8/2006 | 46,008 | $46.36 | $2,132,930.88 |
|  |  | 121,008 |  | $5,567,873.28 |
|  |  |  |  |  |
| MILLER | 7/1/2006 | 68,851 | $42.50 | $2,926,167.50 |
|  | 8/4/2006 | 26,313 | $45.66 | $1,201,451.58 |
|  | 8/4/2006 | 25,656 | $45.66 | $1,171,452.96 |
|  | 10/20/2006 | 19,494 | $46.84 | $913,098.96 |
|  | 1/20/2007 | 13,604 | $48.54 | $660,338.16 |
|  | 1/25/2007 | 11,251 | $50.27 | $565,587.77 |
|  | 2/12/2007 | 10,000 | $50.42 | $504,200.00 |
|  | 4/26/2007 | 123,928 | $52.78 | $6,540,919.84 |
|  | 4/26/2007 | 10,170 | $52.78 | $536,772.60 |
|  |  | 309,267 |  | $15,019,989.37 |
|  |  |  |  |  |
| RAUCHENBERGER | 1/25/2007 | 4,719 | $50.27 | $237,224.13 |
|  | 4/24/2007 | 10,495 | $51.96 | $545,320.20 |
|  | 4/27/2007 | 4,305 | $52.21 | $224,764.05 |
|  |  | 19,519 |  | $1,007,308.38 |
|  |  |  |  |  |
| SCHARF | 4/26/2006 | 125,746 | $42.22 | $5,308,996.12 |
|  | 4/26/2006 | 94,181 | $42.22 | $3,976,321.82 |
|  | 4/26/2006 | 46,549 | $42.22 | $1,965,298.78 |
|  | 7/1/2006 | 86,063 | $42.50 | $3,657,677.50 |
|  | 1/16/2007 | 6,024 | $48.08 | $289,633.92 |
|  | 1/20/2007 | 17,005 | $48.54 | $825,422.70 |
|  | 1/25/2007 | 15,343 | $50.27 | $771,292.61 |
|  |  | 390,911 |  | $16,794,643.45 |
|  |  |  |  |  |
| SCLAFANI | 5/2/2006 | 39,385 | $45.21 | $1,780,595.85 |
|  | 5/3/2006 | 8,615 | $45.30 | $390,259.50 |
|  |  | 48,000 |  | $2,170,855.35 |
|  |  |  |  |  |

| SREDNICKI | 1/25/2007 | 6,883 | $50.27 | $346,008.41 |
|---|---|---|---|---|
| | 5/15/2007 | 10,000 | $52.09 | $520,900.00 |
| | | **16,883** | | **$866,908.41** |
| | | | | |
| STALEY | 1/25/2007 | 26,095 | $50.27 | $1,311,795.65 |
| | 5/8/2007 | 70,350 | $52.44 | $3,689,154.00 |
| | 5/14/2007 | 20,630 | $51.84 | $1,069,459.20 |
| | | **117,075** | | **$6,070,408.85** |
| | | | | |
| WILSON | 5/9/2006 | 43,388 | $46.10 | $2,000,186.80 |
| | | **43,388** | | **$2,000,186.80** |
| | | | | |
| WINTERS | 8/14/2006 | 74,025 | $44.11 | $3,265,242.75 |
| | | **74,025** | | **$3,265,242.75** |
| | | | | |
| **TOTAL:** | | **4,538,503** | | **$211,118,114.02** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of JPMorgan to redress injuries suffered, and to be suffered, by JPMorgan as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. JPMorgan is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.     Plaintiff will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.

88.     Plaintiff is and was an owner of the stock of JPMorgan during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

89.     The current Board of JPMorgan consists of the following twelve individuals: defendants Dimon, Raymond, Crown, Gray, Jackson, Futter, Novak, Burke, Lipp, Weldon, Bowles and Cote.

90.     Defendants Dimon, Raymond, Crown, Gray, Jackson, Futter, Novak, Burke, Lipp, Weldon and Bowles, as members of the Board during the Relevant Period, authorized the repurchases of over $11.6 billion worth of the Company's shares at artificially inflated prices. JPMorgan repurchased these shares under two stock repurchase programs that the Board authorized

during March 2006 and April 2007. The Board's decisions to authorize the stock repurchases were not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider JPMorgan's exposure to the subprime mortgage crisis. Further, defendant Dimon engaged in self-dealing in that he sold his personally held shares while directing the Company to buy shares. Thus, defendants Dimon, Raymond, Crown, Gray, Jackson, Futter, Novak, Burke, Lipp, Weldon and Bowles face a substantial likelihood of liability for their actions. Accordingly, demand is futile.

91.    As a result of his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, defendant Dimon knew the adverse, non-public information regarding JPMorgan's true business prospects. While in possession of this material, adverse, non-public information regarding the Company, Dimon participated in the illegal insider selling by selling 1,507,623 shares of JPMorgan stock for proceeds of $64,495,546.06. Because Dimon received a personal financial benefit from the challenged insider trading transactions, Dimon is interested. Moreover, Dimon faces a sufficiently substantial threat of liability for breach of his fiduciary duties for insider selling. Since Dimon breached his fiduciary duties and is interested, any demand upon him is futile.

92.    Defendants Cote, Futter, Crown and Lipp, as members of the Risk Policy Committee, had a special duty to know and understand material information as set out in the Risk Policy Committee's charter, which provides that the Risk Policy Committee is responsible for overseeing the CEO's and senior management's responsibilities to assess and manage the Company's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputation risk. In performing this oversight, the Risk Policy Committee must: (i) review with management guidelines and policies to govern the process for assessing and managing such risks; (ii) review benchmarks for and major financial risk exposures from such risks; (iii) receive and review reports from management of the steps it has taken to monitor and control such exposures; (iv) review management's performance against these policies and benchmarks; (v) receive and review reports on selected risk topics as

-47-

management deems appropriate from time to time; (vi) review the Company's capital allocation; and (vii) review reports of significant issues prepared by internal risk oversight functional groups. Thus, these defendants had a duty to know and accordingly did know that: (i) JPMorgan faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Risk Policy Committee reviewed and discussed JPMorgan's exposures to the subprime crisis, which has been ongoing since at least 2006, during the course of its reviews and discussions of JPMorgan's financial risks. Despite their knowledge of JPMorgan's exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to JPMorgan by causing or allowing the improper statements alleged above. Accordingly, demand is futile as to defendants Cote, Futter, Crown and Lipp.

93.     Defendants Bowles, Gray and Jackson, as members of the Audit Committee during the Relevant Period, had a special duty to know and understand material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing and discussing with management guidelines and policies for assessing and managing: (i) the Company's exposure to risks, including reputation risk; (ii) the Company's major financial risk exposures; and (iii) the steps management has taken to monitor and control such exposures. Thus, these defendants had a duty to know and accordingly did know that: (i) JPMorgan faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Audit Committee held discussions with the Risk Policy Committee concerning JPMorgan's exposure to the subprime crisis, which has been ongoing since at least 2006. Despite their knowledge of JPMorgan's exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to JPMorgan by causing or allowing the improper statements and earnings press releases alleged above. Thus, defendants Bowles, Gray and Jackson face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

-48-

94. The principal professional occupation of defendant Dimon is his employment with JPMorgan, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, JPMorgan paid Dimon the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $13,000,000 | $7,165,705 | $17,353,321 | $46,445 | $487,858 |

Accordingly, Dimon lacks independence from defendants Raymond, Burke, Novak and Weldon, who are not disinterested and/or independent and who exert influence over Dimon's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Dimon's base salary, bonus and equity compensation. This lack of independence renders defendant Dimon incapable of impartially considering a demand to commence and vigorously prosecute this action.

95. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

96. The Director Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from JPMorgan's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

97. The acts complained of constitute violations of fiduciary duties owed by JPMorgan's officers and directors and these acts are incapable of ratification.

98. Each of the Director Defendants of JPMorgan authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

99.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for JPMorgan for any of the wrongdoing alleged by plaintiff herein.

100.    Plaintiff has not made any demand on shareholders of JPMorgan to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    JPMorgan is a publicly held company with over 3 billion shares outstanding, and over thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Derivatively Against the Director Defendants and Defendant Cavanagh for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    During the Relevant Period, the Director Defendants and defendant Cavanagh disseminated or approved public statements that improperly portrayed JPMorgan's business prospects, growth and margins. In particular, these public statements failed to disclose that the Company was overexposed in the credit and subprime markets and that this overexposure would lead to billions of dollars worth of write-downs. The Director Defendants and defendant Cavanagh knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

103.    The Insider Selling Defendants also sold over $211 million worth of shares of JPMorgan's common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated JPMorgan's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold JPMorgan stock without disclosing the information alleged to have been concealed

herein.

104.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of JPMorgan's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Cavanagh were causing JPMorgan to repurchase over $11.6 billion worth of its own stock on the open market at an average inflated price.

105.    As such, the Director Defendants and defendant Cavanagh violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

        (a)    employed devices, schemes and artifices to defraud;

        (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon JPMorgan and others in connection with their purchases of JPMorgan common stock during the Relevant Period.

106.    As a result of the Director Defendants' and defendant Cavanagh's misconduct, JPMorgan has and will suffer damages in that it paid artificially inflated prices for JPMorgan common stock purchased on the open market. JPMorgan would not have purchased JPMorgan common stock at the prices it paid, had the market previously been aware that the market price of JPMorgan's stock was artificially and falsely inflated by the misleading statements. As a direct and proximate result of the wrongful conduct of the Director Defendants and defendant Cavanagh, JPMorgan suffered damages in connection with its purchases of JPMorgan common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Cavanagh are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against Individual Defendants for Breach of Fiduciary Duty

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants owed and owe JPMorgan fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe JPMorgan the highest obligation of good faith, fair dealing, loyalty and due care.

109.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith, fair dealing, loyalty and due care.

110.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results. The Individual Defendants also had actual or constructive knowledge that they were improperly causing JPMorgan to repurchase over $11.6 billion of its own stock at artificially inflated prices. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JPMorgan has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold JPMorgan common stock on the basis of such information.

115.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold JPMorgan common stock.

116.    At the time of their stock sales, the Insider Selling Defendants knew that the Company was over exposed to the subprime and credit markets. The Insider Selling Defendants' sales of JPMorgan common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

117.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

### Against Individual Defendants for Breach of Fiduciary Duty for Abuse of Control

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence JPMorgan, for which they are legally responsible. In particular, the Individual Defendants abused their positions of authority by causing or allowing JPMorgan to issue statements that improperly portrayed JPMorgan's business prospects and health, including failing to mention the Company's over-exposure to the credit and subprime markets.

120.    As a direct and proximate result of the Individual Defendants' abuse of control, JPMorgan has sustained significant damages. These damages include, but are not limited to, JPMorgan's severe loss of market credibility as reflected in its $43.8 billion market capitalization loss and $11.6 billion paid to repurchase the Company's stock.

121.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of JPMorgan in a manner consistent with the operations of a publicly held corporation.

125.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, JPMorgan has sustained significant damages. These damages include, but are not limited to, JPMorgan's severe loss of market credibility as reflected in its $43.8 billion market capitalization loss and $11.6 billion paid to repurchase the Company's stock

126.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

127.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $11.6 billion to repurchase the Company' stock and paying bonuses to certain of its executive officers.

130.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

131.    Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

## COUNT VII

### Against Individual Defendants for Unjust Enrichment

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of JPMorgan. Their unjust enrichment includes, but is not limited to, the $211 million of proceeds from insider sales and compensation and benefits paid to the Individual Defendants.

134.    Plaintiff, as a shareholder and representative of JPMorgan, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Cavanagh are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding JPMorgan damages;

C.    Directing JPMorgan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JPMorgan and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of JPMorgan to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of JPMorgan's directors, executives and other employees;

4.    a proposal to control insider selling;

5.    a proposal to ensure that JPMorgan prudently expends funds in stock repurchase programs;

6.    a proposal to better manage and disclose JPMorgan's credit risks; and

7.    appropriately test and then strengthen the internal audit and control functions.

D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of JPMorgan has an effective remedy;

E.    Awarding to JPMorgan restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 29, 2008

LASKY & RIFKIND, LTD.
LEIGH LASKY

LEIGH LASKY

250 West 57th Street, Suite 1316
New York, New York 10107
Telephone: (212) 907-0800
Facsimile: (212) 684-2375

Attorneys for Plaintiff

315263_4.DOC

## VERIFICATION

I, Robert Garber, hereby declare as follows:

I was a shareholder of JPMorgan Chase & Co. at all relevant times alleged in the foregoing Verified Shareholder Derivative Complaint. I have read the Complaint and know the contents thereof and authorize its filing. I am informed and believe that the facts therein are true and correct to the best of my knowledge, information and belief and on that ground allege that the matters stated therein are true.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: January 28, 2008

Robert Garber